Case 13-7140. Carla Doe et al. Appellant v. DC et al. Mr. Harrison for the Appellants, Ms. Anderson for the Appellate. May it please the Court. Nick Harrison for the Doe Appellant. I would like to reserve three minutes for rebuttal. Your Honors there was no basis for the summary judgment decision below because for the Constitutional claims You have to talk a little louder. I'm sorry, Your Honor. There was no basis for the summary judgment decision below for the Constitutional claims and at least two of the tort claims there were genuine facts in dispute at minimum. And there were legal reasons why the summary judgment or the motion for judgment on the pleadings being granted was legally in error for the other claims. In terms of the due process claim, there's nothing in the record that would support a justification for the district's failure to have a pre-deprivation hearing to allow the Doe's to be heard as to why removal of at least Oliver and Ann was not justified from the home. The district had 21 days or so, a little longer, that they could have sought a pre-deprivation hearing. They chose not to do so. When they did seek a hearing on the complaint for neglect and abuse, it took them only a day to acquire the hearing. And then they no papered the complaint when it happened. So in this case, if you look at a child-specific analysis on what was the district's basis for removing Ann versus removing Oliver versus removing the two twins, the older children, you don't find a basis, let's take Ann to start, there's nothing in the record that would justify removing Ann. Remember, Ann was the youngest child. I didn't hear an argument in your brief that we should focus only on Ann. I hear it now, but I did not hear this argument before, unless I've forgotten. Well, you may be correct, Your Honor, that we didn't make an Ann-specific argument. That's right. And that's what you're making now, a specific one. So it's really too late to focus only on that. The other side hasn't had a chance to brief this argument. So if you could make the argument that you made in the brief, I think you'd be on better ground. I will do so, Your Honor. So the investigating social worker, Ms. Williams, had made findings, put in the FACES record, that there was an adequate safety plan in place after the Doe's had reported, discovered, and then reported the abuse by the older children. They put alarms on the younger children's doors, Ann and Oliver's. They had removed Wayne and Sarah, the older children, from the home and to temporary locations outside the home. And Ms. Williams interviewed the children. She visited the home and talked to the parents. She was the only district official who did a field investigation, who interviewed witnesses, and the only official who put findings in the official record, which is their procedure, in the FACES database. And her findings were, the safety plan is adequate. There's no immediate danger to the children. Let me interrupt you to ask you what you believe the legal standard is here, because my reading of the cases is that there's probably at least three different legal standards that have been used by the circuits, Circuit Court of Appeals. Some of them have said, or have suggested, that if there's reasonable, articulable suspicion that abuse occurred, that that's all you need to remove the children from the home without a hearing. I mean, you need to have a hearing as soon as possible after that. But haven't some of them said that that's all you need? I mean, others have said that you need, there needs to be a finding that it's an emergency. But there are some that seem to not really require that. What do you think the right standard is? What, if we were writing this, what do you think we should say the standard is, and what cases should we rely on? I think that's the key question, Your Honor. The standard I believe that should apply here is this circuit standard for Fourth Amendment search and seizure generally, which is there has to be exigent circumstances before there can be a search and seizure on an emergency basis. That standard really shouldn't be changed. There's no reason to change it for  If the agency has an opportunity to go to a court and have a pre-deprivation hearing, and to show it's evidence supporting the need for removing the children in question, then there's no emergency, and here there was no emergency. The agency had plenty of time, the safety plan was in place, the investigator that they relied on found the safety plan was adequate. So, you know, where's the emergency? The managers had meetings. William said that the risk is moderate, but there were danger signals. Correct. And the parents wrote a letter saying that they no longer could parent, or they no longer could provide parenting for these four children. That is partially incorrect, Your Honor. It would be the older twins, Wayne and Sarah, that the DOE parents said they could no longer be able to parent because of the inability to afford the proper therapy and treatment for those particular children. Wasn't the point of the letter that if money wasn't provided, the grandmother could no longer take care of Carla, and the other party could no longer take care of Robert? I think it was Sarah, Your Honor, instead of Carla, but you're correct. I'm sorry, I'm very sorry. Yeah, Sarah and Wayne. Yeah, you're correct. Right. I think that's correct. So wouldn't that give the agency the idea that if the agency wasn't able to, or prepared to provide money, that the twins would be going back to the house? There was the potential that at some point in time in the future, the twins would return. However, what we're talking about in the situation of a pre-deprivation hearing in these family courts, it doesn't take more than a day to get a hearing. That's on a different... I think this goes back to Judge Wilkins' question, which is, there are some circuits that say that if there is time to get a warrant, you have to, right? But you agree that there are some circuits that say precisely the opposite, that that is not an element of the test. That's what the 11th Circuit said in Kearney, and I think the 1st Circuit said, and in fact, expressly rejecting the 2nd Circuit's other view. There is a difference, a split in the circuits, on whether time to have a pre-deprivation hearing is even a factor. That's right. So if that's the case, what I'd like you to focus on now is the qualified immunity question. Okay. And under qualified immunity, it has to be clear to a reasonable official that the conduct was unlawful. Right. So if a reasonable official is looking around and sees a split in the circuits, we have held that that is not sufficient to make the person lose their qualified immunity. So just for the purpose of this discussion, you would leave out the argument that there was time for a hearing and just go to the question of whether there was an exigency. I think that is the question, whether there were exigent circumstances. And this Circuit's law was not ambiguous on Fourth Amendment search and seizures in other contexts. In all contexts, there's no reason to believe that standard would change for this context. So I think the district was unnoticed of that law. So what are the exigent circumstances? Well, the only thing the district has identified in the record were the meetings the managers had after Ms. Williams, their chosen field investigator, reported back that the safety plan was adequate. There was no immediate danger. They were then talking about the potential for, as Your Honor points out, a Wayne and Sarah to return at some point to the home. And that might pose a risk, even with the safety plan in place. They speculated that, for some reason, the dose to professionals who had reported the abuse when they discovered it immediately removed Wayne and Sarah from the home and then put these alarms on the doors and increased supervision during the day and convinced the social worker this plan was adequate. Somehow, they would not implement the safety plan that they had just created. Well, is it fair at that point? I appreciate at the end that everybody's concluded that the dose were unaware. But you have children advising that for four years they had been abused. For four years, they'd been abused, right? The younger ones had been abused by the older. And then we later learn, in fact, this was something the social worker didn't even learn. This occurred after she had left. That the older of the youngers had abused the younger of the youngers, right? Right. So is it unreasonable at that point to doubt the words of the parents? I'm not saying that. I want to be clear. In the end, everybody agrees the parents didn't know. Right. But given that information, that is, where you have a household where there's that level of abuse for that long. Is it unreasonable to be suspicious of the parents? Suspicious to the point of wanting to make further inquiries. I think further inquiries may be warranted. The question is, though, is that an exigent circumstance? Or can that inquiry be conducted with the safety plan in place? Well, but when you say safety plan, you mean alarms on doors. Now, presumably, that's the safety plan. No. Well, that's part of the safety plans. The older children were removed physically from the home. Yes. But you sent a letter. Not you. But you sent a letter saying that payment for service is going to run out on September 30th. And that for the grandmother, she can't keep the kid much longer. So we have no idea whether that could occur at any moment. We also... I want to interject something since you mentioned the letter. You said that letter only applied to two of the children. But I have just looked at it again. And my initial take on it was, that's not correct. You said you had to correct me. This language is... It's on page 522 of the Joint Appendix, the very last sentence. I'll trust your... If Your Honor will quote it. But we are no longer able to continue parenting now four children with such significant needs. That doesn't seem to me to be limited to two children. I understand Your Honor's reading. What the Doe's were saying though was, we can handle the two younger children without the older two children present. We can't handle all four at the same time, including the two olders who have these problems we can't afford to treat. That was their intent. There may be some ambiguity in how they stated it. So I understand Your Honor's reading. But I believe that's not what was intended by that communication. Maybe not. But that's part of the record on which the agency based its decision to remove the children. So the question then is not what their subjective intent was. It's whether the agency had, number one, probable cause, and number two, a sound basis for thinking an emergency situation was present. I understand the point, Your Honor. But I don't think there's anything in the record that would indicate the agency actually read that letter like Your Honor read it, because they were in communication with the Doe. But to test again, for myself anyway, I only want you to think about the qualified immunity question. And for that, it's what a reasonable agent would do, not what any particular agent did. Right. So if you could reasonably read it the way Judge Randolph says, that's part of what we have to take into account. Well, if it can't reasonably be read that way, that's a different answer. But that's the only question. With the entire record that the agency had, including their interviews with the Doe parents, including what Ms. Williams conducted, I don't think a reasonable agency official could believe that the Does were about to give up all four of their children. I don't think there's any basis for an official to conclude that. Now, it's a different question whether the record indicated that the two older children that had been placed out of the home might return because of these financial limitations. That question is raised. So then the question is, does that create an exigent circumstance? And the appellant's answer is no, because all they needed to do was call the Doe's, the agency, and say, you know, can you make sure that the two older children don't return home until we have this pre-deprivation hearing? And the Doe's would have said yes. That depends on trusting the Doe's at that point, which the trust doesn't come until later when they get a chance to interview the kids and find out that the Doe's didn't know about this. Here's the evidence that I'm worried about, okay? Tell me what's wrong with this. So we have this going on for four years. We have the possibility that the older kids will come back at any moment. Well, we don't know what moment, right? All we've been told is that they no longer can pay to keep one. Understood. All right, so that seems to be a reasonable social worker might conclude it could be at any moment. There are also visits to the grandmother's house. We don't know whether the younger kids will visit the grandmother where one of the kids, the abusers, is staying. We have alarms on the doors. There seems to be two problems with that. One is the trust for the Doe's at that point. But second, presumably the kids are not in their room all day long. Correct. Right? I mean, that would be a different kind of abuse, right? Right. So what happens when they're not in the room all day during the rest of the period? Um, so those are the things that this doesn't strike me like the usual case where you don't really know whether there's, there's, you know, uh, molestation going on or not. And, and something has, here we know everybody concedes and that agency knew at the time that there was a large amount of molestation going on. And I have to say from the other side, if there had been a mistake and the molestation continued, no one would think the agency acted reasonably by not taking the kids out right away. Usually the DC agencies are criticized for the opposite thing you're criticizing them for. That is for not getting on it right away and protecting the kids. Well, I understand your Honor's point. But the social worker in question here, you know, concluded that there was no immediate danger. So the real question is, could the concern your Honor identifies? And by the way, the safety plan involved increased supervision during the day. The record reflects the social worker concluded that and found it was adequate. So, although they're not in the room all the time, there were other provisions. But, so the real question is, you know, uh, is this some kind of emergency? Are there accident circumstances or can there be less emergency procedures, uh, used? I'm sorry, your Honor, I just. That's all right. No, as long as we ask you questions, as you've heard from the last argument, if you were here. I was pretty far, but isn't the question whether a different social worker could also with a different conclusion also be reasonable? Well, I think so. But the question is, why in the record would allow a different social worker to make that conclusion? You have the managers speculating in meetings, not based on their field investigation, in contradiction to the social worker's findings. And, you know, those meetings happened after those protected activities. You know, uh, this is a summary judgment, uh, determination. And you've got these, these fact sequences that suggest the agency was fine leaving the kids in the home until the protected activity occurred. And then they started looking for a reason. Well, now you're going into a different argument, right? This is no longer your fourth amendment argument. So let's, let's do one at a time. Oh, well. You said protected activity. You mean they're complaining and not moving to the retaliation argument. I do. Okay. So on the fourth amendment, um, and we're on qualified immunity and the Supreme Court has made clear. We are to look, in fact, has reversed us when we didn't do this. We are to look at this first and to look closely at this question. Sure. And the only issue is not, um, the issue here is not what people subjectively thought, but about what a reasonable person would do under the circumstances. Right. And, and the appellant's point is with the established law in the, in the DC circuit regarding exigent circumstances and with the social worker's findings or the evidence that would have been presented to another reasonable social worker from that same record, that there was no rush. I mean, you're only talking about a day or two difference. And that's really the question. It doesn't take more than a day or two for another molestation to happen. And well, and, and, and if the, if the circumstances had remained the same, Your Honor would be correct. But with the two older children removed, who were the instigators of the molestation with the alarms on the doors that not only Ms. Williams found acceptable, but I, we, our position as a reasonable social worker would find that acceptable. And there's nothing in the record to the contrary, nothing in the FACES database to the contrary. You know, if there really was different factual findings by the agency, where are they in the record? They should be in the record. And the fact that they're not is quite telling. Let me ask you this. Let's assume for sake of argument that there is qualified immunity of the individuals you still had a claim against the district. That's correct. Because Brenda Donald Walker made the decision to remove the children. She was a policymaker and therefore the district has liability. That claim would remain notwithstanding qualified immunity being, being recognized. Can I say, I don't see that in your brief either. The opening brief does not mention municipal liability under Monell. There's just not, not a word in here. I had the same question as Judge Wilkins, but I don't see it. There's no site to this issue at all. Your only discussion is about the individuals. I think, Your Honor, that was because we thought it was a non-issue for the district. So. It was what? A non-issue for the district. Qualified immunity wouldn't apply as a defense to the district. So we didn't address it because it wouldn't be an applicable defense for the district. What happened with the, didn't the district court, maybe I got the disposition wrong. Didn't the district court grant summary judgment for all defendants, including the district? It did, but I don't believe the qualified immunity defense was a basis for dismissing. No, no. But there was, there must have been some basis. The district court. I think the district court's basis was that it found that, that there was no Fourth Amendment or Fifth Amendment claim based on. Well, there were no genuine facts in dispute. And you do appeal that finding. We did. But don't you also need to sit to have argued about no liability here in your, in your opening brief in order for us, you do argue about qualified immunity. So. Well, Your Honor, I felt it was included in our argument on the genuine facts in dispute under each of the claims. And we may have, maybe we weren't as explicit as we should have been as saying that applies to the individual defendants in the district as well. That was what we intended. Okay. Are there further questions from the panel? No. Okay. We'll hear from the other side. Thank you. Morning, Your Honor. Stacey Anderson on behalf of the district and the individual named defendants. We'd ask that the court affirm a summary judgment in the district's favor, in favor of all of the defendants in this case. With respect to the Fourth Amendment and Fifth Amendment claim, the district's position, there was, that there is, that there was no constitutional violation here, that the removal of the children was in fact supported by exigent circumstances and that the decision to make the removal at the time it was made was reasonable under all the facts and circumstances of the case. In particular, at the time the removal decision was made, the agency was aware of the pervasive nature of the abuse, the ongoing abuse for a period of four years involving multiple different children and perpetrators of the abuse. There's been much discussion this morning about Social Worker Williams and Williams' report. At the time she made her report and recommendations, she was not privy to all of the information the agency had at the time of the removal decision. In particular, she was not aware of the imminent possibility that the older two children would return to the home. Her finding of lack of risk to the children was predicated upon the absence of the two older children from the home. And again, the agency was repeatedly told by the Does that their return was potentially imminent. The second factor that she was unaware of was the fact that Oliver Doe had been perpetrating abuse on Ann Doe. That disclosure was made after Ms. Williams conducted her investigation on October 8th or 9th when the children underwent forensics interviews. So Ms. Williams was not privy to all the information. But didn't at JA 590, Brenda Donald Walker, who is a person who you say made the decision on October the 20th to remove the children from the home. She testifies that the basis for the removal was the potential for unsupervised visitation by Oliver and Ann with Sarah over at the grandmother's house where Sarah was staying. That's what she says was the was the immediacy. Was that that unsupervised visitation could happen? Correct, Your Honor. Okay. She's the decision maker, and she says that that's the reason. Yes, correct. Okay, so on October the 20th, the CFSA workers show up at the house at nine o'clock. It's a school night. It's a Wednesday night. These are a second grader and a fourth grader. Presumably they're in their jammies. They're at home. The Sarah that Brenda Donald Walker is worried about is at the grandmother's house. What's the exigency then that there's going to be some sort of unsupervised visitation between the fourth grader and the second grader and Sarah, who's at another house when you can go to court the next morning? What's the exigency in the course of that next 12 to 14 hours? Again, Your Honor, I don't think that Ms. Donald Walker's decision to remove predicated solely upon Well, that's what she testified. She was aware of the other factors as well, Your Honor, and this is an objection. She was asked what was the reason, and that was the answer she gave. And again, Your Honor, she was, again, having been deposed five years after the fact was somewhat vague on her recollection, but it was undisputed that all of the persons who participated Well, couldn't a reasonable jury conclude that if that's the only reason that she gave, that that's the only one that they should credit, and that there was no reason to believe then that there was, or that a reasonable jury could conclude that there was no exigency over the next 14 hours or so before we could go to court, if that was the concern? Again, the standard is one of objectiveness, so it's whether a social worker possessing all the information that was available to her at an objective basis for making the decision. I'm not talking about qualified immunity. I'm talking about just a constitutional violation. But again, it's an objective standard, Your Honor. The Fourth Amendment reasonableness standard is an objective standard. The subjective intent of the officers is not generally relevant to the inquiry. It's a question of whether an officer possessing all of the information available to the decision maker would have a reasonable basis for that decision. And again, I think the record is clear that there were several factors, and the district court agreed in finding that there were several factors that were available to the agency and on which the agency relied in making that decision. It was not simply solely the contact between the children and the grandmother. Who was Michelle Jones Brickman? I apologize, Your Honor, I didn't hear you. Michelle Jones Brickman. She was the woman we're talking about, supervisor, is that right? She was. She's not a named defendant, but yes, she was a supervisor. And she testified at 574, we at that point did not have the ability to control when the children could return home. There was a safety plan put in place at that time. We couldn't enforce it. We couldn't make it happen. And again, because the accident going on for so long, there was a concern for the children's safety. Correct. And Brenda Donald Walker was privy to this information. Again, her memory was somewhat foggy on the specific facts. So in looking at the totality of the record, there were meetings between many, many people. This information was all conveyed. This information, I think, was factored in at the time of the decision making. And we get that from looking at the other witnesses' testimony. Jones Brickman also says that the removal was for investigative purposes. Correct. And there was some... So that the kids would be out of the home so that they couldn't be coached and that the parents, you know, they would be able to interview them, I guess, outside of the presence of the parents. That was one factor as well. But again, Brenda Donald Walker doesn't say that. But again, her memory was somewhat foggy five years after the fact as to the specifics. But those were conversations that I think is undisputed occurred between Brenda Donald Walker and the staff members who participated in the numerous meetings to discuss the appropriate course of action. My point is this, is to drill down to the brass tacks. Even if we assume that there's qualified immunity of the individuals, there's still potential for liability of the district. Because Brenda Donald Walker was the decision maker. And there, the question is, could a reasonable jury find that it wasn't objectively reasonable to take these kids away at 9 o'clock that evening when they could have been in court by 11 o'clock the next morning? Isn't that the question? There are several responses to that. The district did assert a Monell defense below. The district court did not reach that issue. So it would be premature at this point for the court to get to the ultimate question as to whether or not Brenda Donaldson Walker qualifies in the context of her decisions, in this case, as a district policymaker or not. Aside from that, again, Your Honor, I think the totality of the information available to the agency at the time the decision was made has to be taken into account. That information included the fact that Oliver had been abusing Anne and remained in the home. That information included the fact that at any point in time, Sarah could be returned to the home when the grandmother determined she was no longer able to care for Sarah. And also, Wayne could be returned to the home at any point in time because the funding for his placement had run out. So you talk about overnight. It's not outside the realm of possibility. Those events could have occurred overnight. And looking at whether or not there's exigent circumstances, the question about the exigency is at the time the decision is made. And at the time the decision was made, these children faced a substantial risk of harm, either from remaining in the home, just Oliver and Anne alone, or through the possibility of Sarah and Wayne returning at any time. And again, it was the Does who emphasized that the possibility of Wayne and Sarah returning was imminent and very real. So I don't think— That didn't come up in the conversations that happened on the 20th. No, I mean, before— That, you know, no one said that the Does gave us reason to believe that these kids were going to come home before we could get to court the next day. I don't think there's anything that expressed, but that was certainly a factor, again, that entered into the decision-making process. So— Does the record—does the record show anything to indicate why you couldn't have gotten a warrant before entering the home at 9 p.m. on October 20th? There was no evidence regarding the process by which a warrant or a court order could have been obtained, the timeframe that that would have required. That was just simply not presented to the district court. Would you—would the agency go—where would the agency go? Would it go to a superior court judge? Yes. Yes, my understanding would be— Are they on 24-hour duty? There are certainly superior court judges who are on call for emergency warrant applications. But again, there's no evidence in the record as to what the usual customary time it would have taken to get a warrant. But the evidence in the record is that when they showed up at 9, they had a petition that said, be in court tomorrow at 11, right? That was an administrative function on the part of the agency. The superior court is in session daily to hear a petition or paper neglect cases. It's a standing—a standing arraignment court. And when the conversation began on the 19th, right, they could have delivered a petition to them then and said, see you on the 20th. We'll let the court decide, right? The decision to remove was made on the 20th. I think that's— But there were conversations on the 19th saying, we want you to voluntarily place these kids in the 21-day—kind of in a voluntary 21-day placement. Correct. We have concerns about their safety. Correct. There were those conversations. But on the 20th, when the DOES refused to voluntarily place the children in the CFSA's care, the decision at that point was made to remove the children. And the question for the exigent circumstances analysis is, were there sufficient exigent circumstances at that point in time for which the district could remove the children without seeking a court order? It's a balancing. It's a risk assessment. It's a question of whether or not the actions of the district officers were reasonable in believing that any further delay would expose the children to an unreasonable degree of risk and that the risk was imminent that Oliver at any point in time could abuse Anne, that Sarah and Wayne at any point in time could be returned to the home and perpetrate the abuse. And it is a question of reasonableness. I think on this record, the agency— Did anybody say that they thought that there was a risk of Oliver abusing Anne in the next 24 hours? There was not that express, explicit statement. I didn't see it anywhere. No, there's not, but it was certainly— I didn't see anybody say that that was a basis for acting within that night. Again, I agree that there's not an explicit statement to that effect. Was there another removal proceeding at the grandmother's house for Sarah? She was removed as well. Was that on October 20th? Yes, Your Honors. That hasn't been challenged. I know it hasn't been challenged, but what's the basis for removing her from the grandmother's house? She's not threatening to abuse any other children, is she? No, but she was also a victim of abuse as well. So she was removed for her own safety. She was the victim of Wayne's abuse. And when did Wayne get removed? He was already in a foster home? Correct, for which funding had run out. An out-of-state placement with a non-CFSA-approved provider, for which funding had run out. And the funding had been provided, I think, by the district to a certain point, but that funding source had run out, and the Does were unable to continue that placement. The only option available, according to the Does, was for him to return to the home. Did Wayne—was Wayne removed from that placement on the night of October 20th? No, he remained in his Virginia placement, keeping in mind that the delinquency petition was filed the day after the removal. And at that point, there was some court intervention and supervision over both Dwayne and Sarah, which I think— Why wasn't he removed for the same reason that Sarah was removed? I don't believe that he was a victim of the abuse, but in fact was the perpetrator of the abuse. Once the other children were removed out of his reach, so to speak, his removal was not necessary. I'm just wondering if the theory—maybe I didn't hear you correctly—was that Sarah's return to the Does was imminent, and therefore that's why the children had to be removed. Did you say that? Yes, yes. Why doesn't Sarah's removal from the grandmother solve that problem? I mean, there's several components to the removal decision. One of them was the investigative component involving Anne and Oliver. So there was a need to get Anne and Oliver, who were the victims of the abuse, outside of the home to investigate. The underlying allegation against the parents was failure to protect them from the abuse or failure to properly supervise them. And so there was an investigative component to Anne and Oliver's removal as well. Again, in any case where you have a victim of child abuse or neglect in the home, it's typical that it's the child that's removed to undergo the medical evaluation to be interviewed to investigate the nature of the neglect and abuse that's been alleged in the home. The negotiations that were going on with the parents, those were over voluntarily turning over the kids, or what was that? Yes, there is a mechanism where the parents could have voluntarily placed the children with CFSA, which would have obviated the need for CFSA to remove the children themselves, unilaterally. Was it the failure of those negotiations that meant that there wasn't going to be another way to protect the children? Is that? I believe so, Your Honor. I think the way I view the record is the parties didn't dispute that there was an exigency in this case. The dispute was over what the proper means to protect the children was. CFSA's view was the children need to be placed in custody with CFSA foster providers. The parents' view was that CFSA should fund Wayne's placement in Virginia, should fund Sarah's placement in a private school of their choosing, and that would address the concerns of the sexual abuse. And CFSA simply disagreed that that was the appropriate approach to protect all four children from the risk of further abuse. And is the idea that on October 20th it became clear that there was not going to be a voluntary turnover and that the only alternative was to the kids?  Removing the children. Is that? Yes. That's an accurate, I think. And then, again, that's the point at which the removal decision was made. And the question then becomes, do we delay that removal to seek a court order, or do we now, knowing that the parents are not going to cooperate and having all of the concerns that are described in the record about the potential failures in the safety plan, the risk of Sarah and Wayne returning, and in Oliver's involvement with each other, all of those factors, do they justify the district proceeding without a court order? And the district's view, both as a matter of Fourth Amendment considerations as well as qualified immunity considerations, that the decision was objectively reasonable, given the totality of facts and circumstances in this case. But the, even if we agree with you on qualified immunity, we would have to reach the issue of whether or not there was a constitutional violation such that the claim could potentially survive against the district, right? Yes. Again, we raised Monell below. It has not been re-raised here. The district court did dismiss the charges against the, or claims against the district based on its conclusion there was no constitutional violation. So, yes, it's potentially Monell. Nobody raised Monell because Monell wasn't the grounds for the decision below, right? That's correct. It certainly was an issue that was pressed below, but it was not passed upon by the district court. So that's explanation for why opposing counsel's brief doesn't have Monell in it. I didn't understand it at the time, now I get it. So, but does that mean we have to decide the constitutional question, or can remand to the district court? If there's no Monell liability, it won't matter whether there's a Fourth Amendment. That is, if the person's not a policymaker, and or if there isn't a policy, and or if there isn't deliberate indifference, we don't, we wouldn't need to reach the constitutional question, is that right? Certainly, Your Honor, if you could make those findings. Why not? It wouldn't be us, I take it. That would be on a remand to the district court. Right, it would, yes. Is there any indication that the district had a policy that you don't have to get a warrant before removing children from the home? No, Your Honor, I think, again, that's a very good question, Your Honor. I think the district's policy is absent exigent circumstances. You need a warrant or a court order to remove children. I think the district's policy is squarely in line with the Fourth Amendment requirements, Fifth Amendment requirements. The question here, again, was it Where's the evidence of that? I would direct the court, I think, to the CFSA's regulations in the statute. Is that that regulation you? Your Honor, I apologize off the top of my head. I don't know, but I don't think, I mean, I'm safe in saying the district's policy is not to remove without a court order, absent exigent circumstances. The question here is whether or not the exigent circumstances existed. But even, assume for the moment, it's getting more interesting as we go along, because it's all stuff that we haven't discussed in the briefs. But assume for the moment that there was time to get a warrant, number one. And two, that the law is that when they're, which we have not yet made, but the law is that you need to get a warrant. Does the district have a policy that even if there is time to a warrant, get a warrant, you don't have to? I take it from what you're saying is they don't have that policy. Not that I'm aware of, Your Honor. So then at the best, this is either a breach of a policy that requires getting a warrant, or it's a situation where there's no policy. That supports what was done. No, I, again, that's- Because if that's true, you're not liable under Monell, right? If you either breach the policy in this one case, or if there was no policy one way or the other in this one case, there's no Monell liability just because, even if individuals violated the Fourth Amendment in this case. Am I wrong about that? Yeah, no, I think your analysis is correct, Your Honor. I just want to- But isn't the individual the head of the agency? The individual is the head of the agency. That's correct. That's not the policymaker? I'm interested in what that Monell argument is. I guess the question is in the context of the decision-making in this case. Was she acting as a district policymaker? And I don't think it's a hard and fast rule that every decision made by someone who holds a policymaking position within the district government is sufficient to subject the district to Monell liability. I think the analysis is a little bit more nuanced and involved in that. And that's why perhaps it's appropriate for the district court to consider the issue in the first place. What she's done in this case is to enact a policy or to do something which may be consistent with the policy or not. Most of the Monell cases are policy cases. Correct, correct. Not supervising prisons. They're failing to give training. They are allowing beating of prisoners as a policy. This is a different, this seems like a different- Exactly. It's a decision in an individual case. I actually don't know, but it seems like all the Monell cases I can remember look like ones of repeated activity, which a policymaker either goes along with or announces. Correct, correct. And again, I don't think there was a policy announced in this case. It was a decision made in an individual case based on unique facts and circumstances presented to the director at the time she made the decision. So I don't know that, you know, it's labeling her as a policymaker establishes Monell liability under those circumstances. I do want to just get back to the premise underlying your question about whether or not there's sufficient time to get a warrant. I think that's not quite the question that needs to be asked. In that abstract sense, there's always time to get a warrant. The question is, at what cost? It's a balancing inquiry. The government has a countervailing interest in here in protecting the health and safety of very vulnerable children. So to answer the question, was there time to get a warrant, that's just not, that's only half of the equation. The question is, is the warrant requirement, is there an exception to the warrant requirement present, given the government's countervailing interest in protecting children from an immediacy of harm? I understand, but I think the second circuit disagrees with the position. The second circuit does suggest that it is a hard and fast rule. Right, and the other two circuits, as I cited, go the other way. So I'm only puzzling over whether we need to decide that question for this circuit or not. I don't believe so, Your Honor. Again, under the qualified immunity standard, certainly that resolves the issue of whether the law was clearly established. And then again, I just wanted to make the point that in deciding what district policy is, or asking that question, it's just not simply a question of how much time the district would have available to it. So explain to me what the argument is for the exigency. If the district had simply taken Sarah, the older girl, out of the grandmother's home and placed her into foster care and left Oliver and Ann there from 9 o'clock p.m. till 11 a.m. the next morning when they were going to be in court. Again, there was testimony that they were concerned about the safety plan that was in place. And I think given the fact that Oliver had subsequently been found to have been abusing Ann, that leaving Oliver and Ann in the home together was a relevant consideration and contributed to the exigency. But no one said that. No one expressly said that, but again, it's an objective inquiry and whether a reasonable social worker possessing all of the information. And there's no dispute that the agency and the decision makers, I think, were aware of this fact. It's just, you know, after five years, you know, discovery depositions, recall just wasn't... But no one said that they thought that the safety plan was deficient in this respect. They said they thought that the safety plan was deficient. And when pressed, what they said was what Brenda Donald Walker said, was that the safety plan would not prevent the two younger kids from going over to grandma's house and having unsupervised visitation with the older sister. Nobody said that they thought that the deficiency in the safety plan was that Oliver might be able to sneak out of his room and abuse Ann. Again, no one expressly stated that. Your Honor is correct. That is not... Well, they've had umpteen depositions and affidavits and everything else to express that if they thought it. What they've described is what they thought the deficiency in the safety plan is what they said. So shouldn't we conclude that that's what their basis was? I think again, Your Honor, the totality of the evidence there was testimony that there was an investigatory aspect to the decision to remove the children. There were other concerns, you know, with Wayne returning to the home. Your initial question was, well, why can't we solve this by removing Sarah? But we also have the Wayne issue as well. You didn't even take Wayne out of that placement that night. We didn't because we had removed the other three children, at which point Wayne no longer had access to them from his Virginia placement. So as the key perpetrator, the need for services from CFSA were not in align with the victim's... Well, even the next day after you went to court, you didn't remove Wayne from that placement. Delinquency proceedings were initiated the next day. He would have been subject to court supervision through the delinquency proceedings. The record doesn't reflect whether his placement changed as a result of that, but there was court monitoring, I believe, of his contact with the other siblings, which would have obviated the concerns with simply leaving it to the Doe's to decide or leaving it to the, you know, the Doe's safety plan as a mechanism to protect the children. Before you sit down, I have one question. Was there anything that the parents did or said on or about October 20th that raised an alarm? I think what... October 20th represented the culmination of the meetings and discussions with the parents, which ended in the determination that the parents were unwilling to voluntarily place their children with CFSA. Given that there was no willingness to voluntarily make that placement and knowing that Sarah and Wayne's placements were not stable, CFSA, I think, felt compelled to act at that point in time based on that information. But nothing beyond that? Not... No, I don't believe so. Can I come back up? We're discussing with Judge Wilkins the question of what the reason of... Donna, I can't remember what her name is. Bridget Daughter-Walker. Yeah. Does it matter? I thought that the rule was what would an objectively reasonable social worker do, not the actual subjective reasons of any social worker in the same way that the car was stopped was because we wanted to get the drugs, as long as an objective observer would say they broke a traffic law. Am I getting the analysis wrong? No, no, Your Honor, and I hope I tried to convey that point. No, you didn't, Donna, but I thought... That is exactly the district's position, that it's the totality of the evidence... It's not just totality. It's who was looking at it. It's not what an individual actually looked at. It was what available to a reasonable observer. Is that correct? Yes, Your Honor. That is correct. Therefore, Ms. Williams' subjective impressions are not controllable. But couldn't a reasonable jury say, okay, it's objective. It's what would a reasonable person think was a problem with the safety plan. But can't they consider what someone's subjective beliefs were in considering whether something is reasonable, objectively reasonable? I think generally the test is an objective one, and the case law is clear that the subjective views of the individual are not the relevant or decisive factor. I mean... They don't say that they're decisive, but I don't know that I've ever seen an instruction that says it's not relevant, that you can't introduce that evidence. No, I mean, I certainly could have introduced the evidence. I just... The standard is one of objectiveness. An officer cannot exculpate himself by simply saying that he had objectively... His reason is controlling. I didn't intend to violate the constitutional rights, therefore... So, I mean, I think certainly the evidence could come in, but whether or not it would be appropriate for the jury to base its decision on that, I question that because it is an objective standard, and they are obligated to consider the totality of the evidence. I think certainly this Court, in conducting its Genova review, would be obligated to look at the totality of the record in this case and all the evidence that's available to CFSA at the time the removal decision was made in answering whether or not its decision was objectively reasonable. Other questions? Okay, thank you. Thank you, Your Honor. Should we ask the Court to affirm? Does the appellant have any time left? Just like in the last case, we'll give you two minutes. Your Honor, in terms of what an objective social worker would have in front of them to make this decision, the appellant's view is that that question is answered by what is in the agency's official record, and in that case, it's what was entered by social worker Dolores Williams. The individual perceptions, speculations, statements of manners in these meetings were not entered into the record. They weren't fact-finding. Wouldn't a reasonable social worker... There was a report that Oliver had abused Anne. That's correct. So they would have that. Whether it was discussed or not discussed, a reasonable social worker would have that. That is correct, and I think that is actually in the record. Ah, okay. But the safety plan is in the record. The safety plan has provisions that would handle the concern about Oliver attempting to reach Anne's room in the evening. There were no findings of fact to the contrary regarding safety plan deficiencies in the record, so there's nothing really for an objective social worker to look at in terms of fact findings that would support this emergency removal. Now, the Doe's were willing to keep Wayne and Sarah in their external placements long enough for a court hearing. There's nothing in the record that indicates the Doe's were going to snap Wayne and Sarah out of their placements the next day, and that, in fact, was not the plan, and had the agency simply said, we're going to have a hearing tomorrow. Can you make sure Wayne and Sarah stay in their placements? The answer would have been simply yes. Is there any discussion one way or the other in the record of that? I think the record only reflects, to some extent, when those placements changed, not the willingness. Now, the Doe's did not object to placement of Wayne and Sarah into the custody of the district, and that the district is sort of painting with a broad brush again that the Doe's objected to turning over the children on the 19th of October voluntarily. Well, that was only true for Oliver and Ann. It wasn't true for Wayne and Sarah. Now, in terms of the investigative purpose... So the earlier discussions that there would have to be a way to be sure that the kids could go back and forth to the schools that they were in, and that they would be able to keep the same therapist, they dropped all those requests? I don't believe they dropped all those requests. But I do think they were willing to have custody of Wayne and Sarah take place, but they wanted certain services to continue for Wayne and Sarah for their well-being. I think I heard the district say that the parties didn't... There wasn't a dispute about the exigency. That's obviously not correct. Regarding Oliver and Ann, there certainly was. It seems obvious that there's a dispute. That's why we're here. I appreciate that, Your Honor, and I appreciate your patience. Further questions from the bench? Thank you. We'll take a matter under submission.
judges: Garland, Wilkins, Randolph